UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————
                                                    )
ALEXANDER KHOCHINSKY,                               )
        70 Little West Street                       )
        New York, NY 10004-7439                     )
                                                    )
                Plaintiff,                          )
                                                    )        Case No. 18-1532
        v.                                          )
                                                    )
REPUBLIC OF POLAND,                                 )
        a foreign state,                            )
                                                    )
                Defendant.                          )
———————————————————)

## COMPLAINT

Alexander Khochinsky ("Khochinsky"), by and for his Complaint against the Republic of

Poland ("Poland"), alleges and states as follows:

### PRELIMINARY STATEMENT

1.      This action seeks declaratory relief and money damages for Poland's retaliation

against Khochinsky for seeking restitution for the property his family fled before the advancing

Nazi army in 1939, never safely to return. When Khochinsky requested that Poland pay for the

land that was seized after his mother fled her home, Poland used false allegations to seek his

extradition and nearly destroyed his livelihood. But for the independent judiciary of the United

States that refused this extradition, Poland might well have succeeded.

2.      In recent years Poland's government has increasingly used Jews as political

scapegoats, and has engaged in historic revisionism and outright denial of the Holocaust, going

so far as to criminalize recently certain statements about the aspects of the Holocaust that took

place within what is now Poland.

3.      This regressive politicking found a target in Khochinsky, who was threatened with the full might of the state for asking questions that Poland does not wish to answer. The matter is Poland's modern day Dreyfus Affair, exposing institutional anti-Semitism in its governing institutions.

4.      This action addresses the bad-faith retaliation against Khochinsky for his attempt to procure restitution for the seizure of land during the World War II and Poland's ongoing attempts to punish Khochinsky for seeking restitution.

5.      Khochinsky's mother, Maria Ioelevna Knoll Khochinskaya ("Maria"), was a Polish Jew born in 1922. Her family owned land and a house in the Polish town of Przemysl.

6.      Maria fled her home in 1941 just ahead of the German army. After she escaped Poland, she met and married Jakov Solomonovich Khochinsky, a Red Army soldier.

7.      Maria died in 1989 and Alexander Khochinsky is her sole heir.

8.      After the fall of Communism, Khochinsky visited Maria's land. He was shocked to see that a Catholic church stood on the property. Maria had never sold her land or received any compensation for it.

9.      Khochinsky was well-aware that Poland is hostile to any claims for restitution or compensation by Holocaust victims. Just this year (2018), Poland's abysmal record on restitution has prompted public criticism by U.S. Senators and the U.S. Secretary of State.

10.     In 2010, Khochinsky learned that a painting he had inherited from his father seemed to match the description of a painting that had reportedly gone missing from a Polish museum during World War II.

11.     Khochinsky hoped that mutual desires for restitution would make Poland more willing to consider paying his family for the land seized in Przemysl. He contacted Poland about both his family's land and the painting.

12.     For the first time, a descendant of Holocaust victims, who was seeking restitution, was also able to offer Poland something. Poland had stonewalled restitution for decades, but this confluence created a historically unique possibility for a breakthrough.

13.     Poland reacted vengefully to Khochinsky's request for compensation. It invented false charges that Khochinsky had knowingly received stolen goods, and it sought to have him extradited from his home in the United States.

14.     The extradition proceeding caused intense hardship for Khochinsky, his wife, and their children. The family's travel documents were confiscated, and Khochinsky was placed on house arrest for months.

15.     Poland doubtless intended that Khochinsky's imprisonment and house arrest were merely the prologue to much worse suffering once Poland secured his extradition on false charges.

16.     The extradition proceeding concluded when the U.S. District Court for the Southern District of New York found that Khochinsky was not extraditable because there was not even probable cause to believe that he had committed the crime with which he was charged.

17.     It was a stunning rebuke to a request that is ordinarily granted almost as a matter of course. Indeed, the Assistant United States Attorney who was acting on Poland's request told the District Court that extradition was a foregone conclusion. The District Court disagreed.

18.     This rare denial of an extradition request underscores the fact that Poland brought its baseless allegations as vengeance and intimidation, and not to pursue justice.

## PARTIES

19.     Khochinsky is a citizen of the United States, originally from the Soviet Union ("USSR"), later Russia. He resides in New York City.

20.     Poland is a foreign state.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Poland pursuant to 28 U.S.C. § 1330 and 28 U.S.C. §§ 1605-07, the Foreign Sovereign Immunities Act ("FSIA"). Process will be served on all Defendants pursuant to 28 U.S.C. § 1608.

22.     Poland is not immune from suit pursuant to the FSIA, 28 U.S.C. § 1605(a)(1) and (5).

23.     Venue is proper in the District of Columbia against Poland pursuant to 28 U.S.C. § 1391(f)(4) as a case brought against a foreign state (Poland).

## FACTUAL ALLEGATIONS

24.     Przemysl had a rich history of a Jewish community that dated back centuries. References to a synagogue date back as far as 1560, with the Old Synagogue completed in 1594. Przemysl's Jews managed over the following centuries, enduring various bouts of anti-Semitism and pogroms under Polish, Lithuanian, and Austrian rule. Just before the outbreak of WWI, an Austrian Empire census showed that the Jewish population of Przemysl was almost 30% of the city.

25.     Maria was born there in 1922.

26.     In 1933, Adolf Hitler and the Nazi party gained control of the German government. Even as they imposed their cruel regime on Jews, political opponents, and countless other victims throughout Germany, they also sought to expand their power throughout Europe.

27.     Communists internationally and within Germany were among the Nazis' earliest targets for political violence. As Germany built up its military illegally in the 1930s, many assumed that the USSR would be Nazi Germany's first point of attack as its ideological foe.

28.     To the great surprise of the world, Nazi Germany and the Soviet Union announced on August 23, 1939 that they had signed a mutual non-aggression treaty, better known as the Molotov-Ribbentrop Pact after the foreign ministers of the USSR and Germany at the time, Vyacheslav Molotov and Joachim von Ribbentrop, respectively.

29.     In one stroke, mortal enemies — National Socialism and Soviet Communism— became putative allies.

30.     Unbeknownst to the rest of the world, the Molotov-Ribbentrop Pact contained a secret protocol. In the secret protocol, Germany and the USSR agreed to divide Poland immediately, as well as to permit the division of the Baltic states, Finland, and Romania into "spheres of influence." Poland east of the Pisa, Narev, Vistula and San rivers would be annexed by the USSR, leaving the remainder to Germany.

31.     Barely a week after the Molotov-Ribbentrop Pact, WWII began on September 1, 1939 when Germany invaded Poland. Later the same month, the USSR moved into eastern Poland, with far less attention.

32.     The city center of Przemysl was within the area annexed by the USSR, but the boundary ran through the city itself. Thankfully for Maria as a Jew, her home was not in the Nazi-occupied area.

33.     Maria became a Soviet citizen.

34.     On June 20, 1941, Maria and her grandmother had traveled east to Lviv (then within the USSR, now in Ukraine) to visit her mother for the Sabbath observance beginning Friday night at sundown. Maria and her grandmother stayed there Saturday night as well.

35.     The next morning at 4:00 am—June 22, 1941—Germany broke the Molotov-Ribbentrop Pact in Operation Barbarossa, and invaded the Soviet Union. Every Jew in Poland's former territory and the parts of the USSR invaded by the German Wehrmacht was immediately in mortal danger.

36.     As noted above, the boundary between the Nazi and  Soviet occupations of Poland ran through Przemysl. Thus, some of the first steps taken by the Wehrmacht in Operation Barbarossa were in Przemysl itself. Had Maria not been visiting her mother, she would have been among its first victims.

37.     This was particularly tragic because thousands of Polish Jews had fled Germany's brutal General Government administration of Poland into ostensibly Soviet territory.

38.     Germany established a ghetto in Przemysl. The synagogue was destroyed, and deportations of the by-then nearly 24,000 Jews began in late 1942. By September, 1943, nearly all of Przemysl's Jews had been deported to Auschwitz and Belzec.

39.     Maria managed to flee east, first to Kiev, and eventually to Tashkent in Uzbekistan. She met her husband there at a military hospital.

40.     The Red Army re-took Przemysl in 1944.

41.     More than ninety percent (90%) of the Polish Jewish community there had been murdered.

**Ongoing Anti-Semitism and Antagonism to Restitution**

42.     After World War II, Poland regained its independence. Poland's borders were established in the East pursuant to the so-called Curzon Line, several kilometers to the east of Przemysl, placing the city within Poland once again.

43.     For their part, Maria and Jakov Khochinsky settled in Leningrad (USSR), where Alexander was born.

44.     Very few Jews remained in liberated Poland. Most of them had been killed; those who had fled were establishing new lives in new countries.

45.     Although millions of Jews had lost their property during the Holocaust, Poland has never made any meaningful effort to make restitution to the surviving Jews or to the victims' families.

46.     Poland has struggled since with its relationship to the Holocaust, much of which took place on Polish soil.

47.     After the fall of Communism, new scholarship shined an unwanted spotlight on the treatment of Poland's Jews during the Holocaust by Poles.

48.     As explained in the award-winning book *Neighbors* by historian Jan Gross, not all the anti-Semitic atrocities committed were performed by the Wehrmacht or Germans. Rather than confront this history openly, Poland has buried the past.

49.     This uncomfortable history post-dates the war as well. Surviving Jews were subjected to discrimination and even violent pogroms. This history was covered up during the Communist era.

50.     During the 2009 Prague Conference, Poland joined forty-five other countries in affirming the Terezin Declaration on Holocaust Era Assets and Related Issues.

51.     Poland, and the other signatories of the Terezin Declaration, agreed that "the

protection of property rights is an essential component of a democratic society and the rule of

law."

52.     The Terezin Declaration provides:

> We consider it important, where it has not yet been effectively achieved, to
> address the private property claims of Holocaust (Shoah) victims concerning
> immovable (real) property of former owners, heirs or successors, by either in rem
> restitution or compensation, as may be appropriate, in a fair, comprehensive and
> nondiscriminatory manner . . . . The process of such restitution or compensation
> should be expeditious, simple, accessible, transparent, and neither burdensome
> nor costly to the individual claimant[.]

53.     The Terezin Declaration further provides: "We recommend, where it has not been

done, that states participating in the Prague Conference consider implementing national

programs to address immovable (real) property confiscated by Nazis, Fascists and their

collaborators."

54.     Despite these commitments, Poland has not taken any meaningful steps to return

property to Holocaust victims and their families, and it has instead obstructed victims who seek

restitution.

55.     In 2015, Poland passed a law that makes it nearly impossible for victims and their

heirs to seek restitution for property located in Warsaw. The law barred any claims by people

who had not met a prior, December 1988 filing deadline, and it created hurdles even for those

victims who had met the deadline.

56.     Poland is in the grip of a reactionary, anti-democratic government that is more

than happy to stoke ancient prejudices for political gain. As noted in *The Economist* recently;

> This combination of subtle and brazen nationalist revisionism captures the two-
> and-a-half years of PiS [Law and Justice party] rule. The party has purged the
> public administration, made it illegal to accuse the "Polish nation" of complicity
> in the Holocaust, and peddled conspiracy theories about the aeroplane crash in

2010 which killed then-president Lech Kaczynski and 95 others outside
Smolensk, in Russia. It has turned a blind eye to chauvinism among its supporters,
while prosecuting peaceful counter-protesters at the monthly commemorations of
the Smolensk disaster led by Lech's twin brother, Jaroslaw [], who is PiS's
chairman.

57.     In response to Poland and other countries that have not complied with their

Terezin Declaration obligations (to say nothing of their moral obligations), the U.S. enacted the

Justice for Uncompensated Survivors Today ("JUST") Act.

58.     The JUST Act was signed into law on May 9, 2018. It requires the Secretary of

State to submit a report on the signatories to the Terezin Declaration, which shall include

information about those countries' respective laws and policies in light of their obligations under

the Terezin Declaration. There is little question that Poland's failure to comply was and will be a

focus of the law's reports.

59.     Senator Tammy Baldwin, who sponsored the bill, said: "[B]y highlighting this

issue as an American foreign policy priority, we will spur action in countries that are falling

short of their obligations."

60.     Poland is currently considering legislation that purports to provide a path to

restitution, but that would actually shut the door on most victims and their heirs. If enacted, the

law would limit Holocaust-related restitution to Polish citizens living in that country, effectively

punishing Holocaust victims who fled their country to save their lives. This law also limits the

restitution amount to a fraction of the property's actual value, which is not meaningful

restitution; it merely reduces the amount of the theft.

61.     In response to this proposed law, an alarmed coalition of U.S. Senators sent a

letter to Prime Minister Mateusz Morawiecki of Poland on March 26, 2018.

62.     Fifty-nine (59) Senators signed the bipartisan letter, which stated: "We have been disappointed that Poland remains the only major European country that has not passed a national, comprehensive law for the restitution of, or compensation for, private property[.]"

63.     The Senators expressed their conviction that the proposed law "falls short of the standards set forth in the Terezin Declaration and—if passed without amendment—would be a failure of justice. We are deeply concerned that the bill, in its current form, would discriminate against virtually all American survivors and heirs on the basis that they are not currently citizens of Poland and that they were not residents of Poland when their property was nationalized."

64.     Poland's approach to restitution is consistent with its persistent refusal to consider any measure of responsibility for its persecuted people.

65.     Just this year, Poland passed a law criminalizing speech that blames Poland for crimes committed during the Holocaust.

66.     The U.S. has repeatedly expressed its opposition to this law. On February 6, 2018, then-Secretary of State Rex Tillerson issued a press statement expressing the United States' disappointment in this law. Secretary Tillerson reported that the law "adversely affects freedom of speech and academic inquiry."

**Khochinsky's Mother Lost Her Home During the Holocaust**

67.     All of Maria's family members who remained in Przemysl were murdered by the Nazis.

68.     Maria was the heir to her family's property, and after her family was destroyed, the land and house were her rightful property. After her death, the rights in the property passed to Khochinsky, her son.

69.    When Khochinsky returned to Przemysl in the 1990s with his wife and son, he discovered that his mother's home had been destroyed, and a Catholic church stood on her land.

70.    Maria was never compensated for the property that was seized as her family was murdered.

**Khochinsky Seeks Compensation for His Mother's Property**

71.    Khochinsky was keenly aware that Poland has a hostile attitude toward Jewish restitution claims. He reasonably believed that any claim for the restitution of his family's property was likely to be futile.

72.    Khochinsky's assessment of the situation changed in 2010, when he saw an opportunity to have a meaningful negotiation with the Polish government in connection with a painting that he had inherited.

73.    In 1991, Khochinsky inherited *Girl with Dove*, a painting by Antoine Pesne, pursuant to his father's will. His parents had owned the painting since before his birth, and it had hung in their apartment in Leningrad.

74.    In or around 2010, Khochinsky learned that a painting that had been reported missing from Poland was similar to his *Girl with Dove*.

75.    The missing painting had belonged to the Wielkopolskie Museum in Poznan, Poland, which purchased it in 1931. The painting was allegedly removed from the museum for protection and subsequently looted by Nazis and taken to Germany.

76.    Jakov Solomonovich had told Khochinsky that he had acquired the painting after World War II, and that the painting was previously in Germany.

77.    Jakov Solomonovich himself never entered Germany or Poland during or immediately after World War II. In 1943, he was seriously wounded near Izium (Ukraine) and

was immediately evacuated to the east, and finally to Tashkent. By 1944, when Soviet forces entered Germany, Jakov Solomonovich was a civilian working in Leningrad.

78.     If, in fact, *Girl with Dove* were the missing painting, Khochinsky did not know that it had been taken from Poland, or that the painting had previously belonged to a museum. He first learned about those claims in 2010. Apart from the provenance, there are additional reasons to conclude that Khochinsky's painting is <u>not</u> the missing work. The putative expert that Poland put forth to accuse Khochinsky ignored these important details.

79.     Although Khochinsky did not know whether the painting he had inherited was in fact the missing painting, he noticed the similarities between the paintings and thought that Poland might consider it a worthy substitute.

80.     Khochinsky believed that by offering an exchange, instead of simply demanding compensation for his mother's property, his discussions with Poland could be more fruitful. He offered to relinquish his painting to Poland—even if  it was not the one that Poland sought.

81.     Khochinsky therefore wrote to Poland. In his message, he addressed the issue regarding the property and the separate issue regarding the painting, and he proposed an exchange, his focus being recognition of his mother's suffering.

82.     On May 10, 2010, a representative of Poland indicated willingness to negotiate but stated that Poland wanted an expert to evaluate the painting.

83.     Maciej Michalowski, a curator, evaluated the painting at Khochinsky's gallery on July 22, 2010.

84.     Mr. Michawlowski reportedly concluded that the painting was the missing artwork but did not inform Khochinsky of this conclusion.

**Poland Pursued a Retaliatory Extradition Proceeding**

85.     Initially, Poland attempted to pressure Khochinsky through diplomatic channels in Russia to harm Khochinsky's business. Russia refused Poland's request to seize *Girl with Dove* and bring it to the Polish Embassy in Moscow, and otherwise turned down Poland's demands. When that failed, Poland began bad-faith criminal proceedings against Khochinsky in retaliation for his request for restitution.

86.     On January 9, 2013, a Polish Court accused Khochinsky of purchasing the painting unlawfully, and of knowing that the painting had supposedly been obtained illegally at the time he acquired it.

87.     This was, of course, untrue. Khochinsky never purchased the family heirloom, and he had no way of knowing whether the Nazis had looted it from a Polish museum many decades before.

88.     Poland also assigned an unsupported and fabricated "value" to the painting to elevate the severity of the "crime."

89.     Under normal circumstances, Poland does not institute criminal proceedings against people who, in good faith, purchased, inherited, or otherwise received art that was once allegedly stolen.

90.     In 2014, Wojciech Kowalski, a Polish official leading the Foreign Ministry's property restoration unit, told a reporter for *The Economist* "that negotiations over the return of stolen Polish artwork can take up to four years."

91.     For example, in 2017, Poland asserted that a painting scheduled for a Sotheby's auction—*The Sword Dance* by Henryk Siemiradzaki—had been improperly removed from Poland. Like Khochinsky, the current owner acquired the painting through his parents. Poland

13

announced that it intended to proceed through the civil court system in the U.K. in the *The Sword Dance* dispute.

92.     The unique and baseless criminal allegations against Khochinsky were not driven by Polish restitution policy. Instead, they were brought to punish Khochinsky for his fair and reasonable request that restitution be reciprocal.

93.     A "Wanted Person Notice" ordering a search for Khochinsky's arrest was issued on January 25, 2013.

94.     On July 1, 2013, Poland submitted a request for Khochinsky's extradition to the U.S. Department of State in Washington, D.C. In the following months, Poland sent further information to the U.S. Department of Justice in Washington, D.C.

95.     In a letter dated November 3, 2014, Poland enclosed "Supplementary Information to a  Request for Provisional Arrest and Extradition"  in Polish with an English translation. The documents were sent to the Department of Justice in Washington, D.C.

96.     In this "Supplementary Information," the District Prosecutor's Office in Poznan informed the U.S. Department of State that Khochinsky acquired *Girl with a Dove* "despite being aware of the fact that the painting originated from a prohibited act—looting of property in 1943 by the then authorities of the German Third Reich."

97.     That accusation was baseless and purely in bad faith. Khochinsky had no way of knowing the painting's history before his father was when he (Khochinsky) inherited it in 1991. Poland again sent supplementary information to the Justice Department in Washington, D.C. in a letter dated January 14, 2015. This supplementary information included an admission that a "witness was unable to explain how the painting by Antoine Pesne 'Girl with a Dove' came to be in Alexander KHOCHINSKIY's collection."

98.     On February 25, 2015, an Assistant United States Attorney filed a petition for a

certificate of extraditability in the United States District Court for the Southern District of New

York.

99.     At the commencement of the filed complaint, the Assistant United States Attorney

who signed the document attested: "In this matter I act for and on behalf of the Government of

Poland."

100.     On February 26, 2015, eight FBI agents arrived at Khochinsky's house in the

early morning and arrested him in front of his children.

101.     Khochinsky was publicly taken from his home in handcuffs. His thirteen-year-old

daughter was crying during the arrest.

102.     He was imprisoned from February 26 to March 9, 2015.

103.     After Khochinsky was released, he was subject to home arrest and subject to

electronic monitoring.

104.     Khochinsky had to obtain the Court's leave to attend his daughter's middle school

graduation and to use the exercise facilities in his own apartment building. With those rare

exceptions, he did not leave his apartment for months.

105.     Khochinsky's family was also punished for the crime he did not commit.

Khochinsky's wife, Tatiana Khochinskaya, and his children were required to relinquish their

travel documents. Ms. Khochinskaya also had a business in Russia that inevitably suffered when

she could not travel.

106.     On April 2, 2015, Poland's Ministry of Justice sent additional documents to the

U.S. Department of Justice in Washington, D.C. for use in the extradition proceeding.

107.    The documents sent on April 2, 2015 included written answers to questions. In one of these answers, Poland acknowledged Khochinsky's described provenance for the painting, and concluded: "[T]he local unit has no evidence that could clearly rule out or confirm the presented above versions by Aleksander Choczyński of his acquisition of the painting 'Girl with a Dove[.]'"

108.    On April 9, 2015, Poland's Ministry of Justice again sent a letter to the U.S. Department of Justice in Washington, D.C. that enclosed documents for use in the extradition proceeding. Although Poland had admitted its uncertainty about the facts, it continued to insist on extradition. One of the enclosed documents, dated March 26, 2015, stated: "in view of the law in force in the Republic of Poland, there is no grounds for negotiations involving resignation of the suspect's prosecution."

109.    In a memorandum filed on April 23, 2015, the Assistant United States Attorney representing Poland acknowledged: "the Polish government has not taken a position as to precisely when or how Khochinsky came into possession of the painting," yet Poland continued to pursue this retaliatory extradition.

110.    During the June 17, 2015 hearing in this proceeding, the Assistant United States Attorney representing Poland's interests acknowledged: "I do not believe there is evidence in the record that goes directly to Khochinskiy's knowledge prior to his sending an email to the Polish embassy in Moscow" in 2010.

111.    Poland, through the U.S. attorneys representing its interests, nonetheless continued to try to obtain extradition by arguing that, even if Khochinsky did not wrongfully obtain the painting, he could still be held culpable for other acts, such as allegedly concealing the

painting. These acts were not the basis for the Polish court's findings against Khochinsky, and the District Court rejected this attempt to misconstrue the basis for extradition.

112.    In an Opinion and Order dated August 3, 2015, the District Court found that the U.S. had failed to establish probable cause, which is a precondition of extraditability.

113.    The Court noted that "the Government acknowledged that there was no direct evidence of Khochinsky's knowledge before May 18, 2010 that 'Girl with Dove' was stolen. . . . Indeed, the Polish Prosecutor admitted that Poland did not know when or under what circumstances Khochinsky acquired the Painting."

114.    The Court concluded:

> To the contrary, the only evidence in the record tended to corroborate Khochinsky's claim that he inherited "Girl with Dove" from his father and only learned that Poland was seeking it in 2010. Both of Khochinsky's nephews testified that they recalled seeing the Painting hanging in their grandparents' apartment. Moreover, the undisputed evidence showed that Khochinsky openly displayed the Painting in his gallery in Moscow for many years and listed it in published catalogs. . . . This behavior is inconsistent with someone who knows his property is sought by a foreign sovereign.

115.    Although the Court rightly refused to authorize extradition, substantial damage had already been done. During the pendency of the criminal action, Khochinsky was barely ever allowed to leave his home.

116.    For a man whose business depended upon partners, clients, exhibitions, museum, and art fairs in Europe and Russia, this imprisonment was utterly devastating. Khochinsky's livelihood was all but destroyed.

## CAUSES OF ACTION

### Count I
### First Amendment Retaliation

117.    Khochinsky restates and incorporates by reference the preceding paragraphs as though fully set forth herein.

118.     As a foreign national living in New York in 2015 (before he later became a citizen), Khochinsky was protected by the First Amendment of the United States Constitution, which protects, *inter alia*, freedom of speech.

119.     Poland sought Khochinsky's extradition pursuant to the 1996 U.S.-Poland Extradition Treaty.

120.     Despite Poland's claim that it sought extradition based on (entirely fabricated) criminal charges, the extradition was in retaliation for Khochinsky's speech about the Holocaust in Poland and Poland's restitution obligations.

121.     In its attempt to have Khochinsky extradited, Poland secured the cooperation of the U.S. Department of Justice and the U.S. Department of State. Poland acted through the Department of Justice; the Assistant United States Attorney in the criminal proceeding even attested that she acted on behalf of the Government of Poland in that matter.

122.     Poland deliberately, and successfully, used the extradition process and related criminal proceeding to deprive Khochinsky of his rights under the First Amendment of the United States Constitution.

123.     Khochinsky was arrested, imprisoned, and subjected to house arrest, which caused him emotional distress and financial harm.

124.     These proceedings against Khochinsky failed for lack of probable cause. As the Court held: "[T]he Government failed to adduce any evidence that Khochinsky knew 'Girl with Dove' was stolen at the time he acquired it. Accordingly, the Government has failed to establish probable cause to believe that Khochinsky committed the crime with which he is charged. It follows that the Government's petition for a certificate of extraditability for Khochinsky must be, and hereby is, denied and the Extradition Complaint dismissed."

18

125.     The wrongful arrest, imprisonment, house arrest, and extradition proceedings caused Khochinsky substantial damages, including loss of income in an amount to be determined at trial.

## Count II
## Quiet Title

126.     Khochinsky restates and incorporates by reference the preceding paragraphs as though fully set forth herein.

127.     Under applicable Russian law, Khochinsky is the true and legal owner of *Girl with Dove,* a painting that he inherited from his father.

128.     Poland pursued Khochinsky on criminal charges based on false allegations that Khochinsky obtained the painting illegally.

129.     Although an extradition proceeding resolved in Khochinsky's favor, there has been no resolution of the underlying criminal charges, and Poland has never acknowledged that Khochinsky obtained the painting legitimately.

130.     Khochinsky asks this Court to establish his title to *Girl with Dove.*

## Count III
## Tortious Interference with Advantageous Relations

131.     Khochinsky restates and incorporates by reference the preceding paragraphs as though fully set forth herein.

132.     In the years preceding his arrest, Khochinsky had a successful art business that he maintained through frequent trips to galleries, exhibitions, client meetings, and other events in Europe.

133.     By deliberating causing Khochinsky to be imprisoned and then subject to house arrest for over than five months, Poland crippled Khochinsky's business.

134.     Khochinsky's business was all but destroyed during the months when he could not leave New York.

135.     This caused Khochinsky substantial damages, including loss of income in an amount to be determined at trial.

## Count IV
## Aiding and Abetting Trespass

136.     Khochinsky restates and incorporates by reference the preceding paragraphs as though fully set forth herein.

137.     Maria's family lived in their home in Przemysl until they were murdered during the Holocaust.

138.     The ownership of that property passed to Maria, who owned it until her death in 1989. At that time, it passed to Khochinsky, her heir.

139.     Maria's right to her family's property was never respected. The house was destroyed, and the land was subjected to ongoing trespass. It is currently occupied by the Catholic Church.

140.     In 2010, Khochinsky sought to address this ongoing trespass and to reach a settlement regarding the property that had been seized from his family.

141.     Poland retaliated against him, and sought to dissuade any possible future attempts he might make, by pursuing his extradition on fabricated criminal charges.

142.     Poland's conduct aided and abetted the trespass.

143.     This caused Khochinsky substantial damages, in an amount to be determined at trial.

**Count V**
**Abuse of Process**

144.    Khochinsky restates and incorporates by reference the preceding paragraphs as though fully set forth herein.

145.    Poland used legal process in the United States, including by and through the actions of the Assistant United States Attorney who represented Poland during extradition proceedings, to obtain an improper goal.

146.    Poland used the extradition proceedings as a chilling demonstration of state power against the child of Holocaust survivor in order to quench even a whisper of dialogue on the topic of Poland's obligations regarding Holocaust restitution.

147.    Poland wrongfully used the menace of extradition, coupled with actual imprisonment, to punish Khochinsky for his advocacy in favor of Holocaust restitution by the Polish government. If the extradition had been successful, Khochinsky doubtless would have faced even harsher punishment in Poland.

148.    Furthermore, Poland used this public proceeding to warn other Jews that they would face the wrath of the Polish state —and its power to reach them both in Poland and abroad—if they dared to seek restitution or engage in other speech that Poland deems unacceptable.

149.    In support of its attempt to extradite Khochinsky, Poland fabricated criminal charges and made false statements. These are improper acts and not part of the legitimate extradition process.

150.    Although the extradition attempt was not successful, Poland nonetheless succeeded in its goal of punishing Khochinsky.

151.     During his weeks of imprisonment and months of house arrest, Khochinsky

suffered severe harm, including emotional distress and loss of income.

152.     This caused Khochinsky substantial damages, in an amount to be determined at

trial.

## PRAYERS FOR RELIEF

WHEREFORE, Alexander Khochinsky respectfully prays this Court to:

A.  Enter judgment in his favor on all counts in this Complaint; and

B.  Issue an order declaring that he legally owns *Girl with Dove,* which he inherited from his
    father; and

C.  Award him damages for the income and other business-related losses that resulted from
    his period of imprisonment and house arrest; and

D.  Award him damages for the emotional distress he suffered during and resulting from the
    criminal proceeding against him; and

E.  Award him damages for the trespass to his family's land; and

F.  Award him punitive damages for Poland's egregious conduct; and

G.  Award him attorney's fees and costs; and

H.  And award other such relief as this Court may deem just.

June 27, 2018                              SULLIVAN & WORCESTER LLP

                                           /s/ Nicholas M. O'Donnell
                                           Nicholas M. O'Donnell (DC Bar No. 1011832)
                                           One Post Office Square
                                           Boston, Massachusetts 02109
                                           Telephone: (617) 338-2800
                                           Facsimile:  (617) 338-2880
                                           Email: nodonnell@sandw.com

                                           *Attorneys of record for Plaintiff Alexander
                                           Khochinsky*